******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

IN RE JEWELYETTE M.*
JOHN N. ET AL. *v.* COMMISSIONER OF
CHILDREN AND FAMILIES
(SC 21055)

IN RE JEWELYETTE M.
(SC 21068)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Alexander, Dannehy and Elgo, Js.

*Syllabus*

The foster parents of the minor child, J, appealed from the decision of the trial court to remove them as intervenors in the dispositional phase of neglect proceedings concerning J. Although the foster parents were initially granted intervenor status, the trial court later granted the motion of the petitioner, the Commissioner of Children and Families, to remove them as intervenors during the pendency of the neglect proceedings in light of the Appellate Court's then recent decision in *In re Ryan C.* (220 Conn. App. 507), in which the court concluded that nonrelative foster parents are precluded by statute (§ 46b-129 (p)) from intervening in neglect proceedings. After the foster parents were removed as intervenors, and while their appeal from that removal was pending, the trial court held a hearing on the petitioner's motion to revoke the commitment of J to the petitioner's custody and ultimately granted the motion and transferred guardianship of J to J's biological father. Subsequently, the foster parents filed a writ of error challenging the court's decision on the motion to revoke. On appeal from the trial court's removal of them as intervenors, the foster parents claimed that *In re Ryan C.* was wrongly decided and that the trial court improperly had removed them as intervenors under that authority. In their writ of error, the foster parents claimed, inter alia, that the trial court had deprived them of their right to be heard and to comment under § 46b-129 (p) by barring them from attending the entire revocation hearing and from giving a sworn statement after hearing the evidence. *Held*:

The trial court improperly removed the foster parents as intervenors on the basis of *In re Ryan C.*, this court having concluded that *In re Ryan C.* was wrongly decided and must be overruled, and, accordingly, this court reversed the trial court's order removing the foster parents as intervenors and granted the foster parents' writ of error insofar as they sought reversal or vacatur

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the court.

of the trial court's revocation order, and the case was remanded for a new revocation hearing.

This court concluded that § 46b-129 (p) does not bar a trial court from granting a foster parent's request for permissive intervention in the dispositional phase of a neglect proceeding under the relevant rule of practice (§ 35a-4 (c)) and overruled *In re Ryan C.* to the extent that it held otherwise.

There was no question that nonrelatives are permitted to intervene in the dispositional phase of neglect proceedings under Practice Book § 35a-4 (c), so long as the court finds that it is in the child's best interest to do so, and, contrary to the Appellate Court's conclusion in *In re Ryan C.*, it was not evident that the legislature nullified the trial court's authority to grant foster parents permissive intervention under that rule of practice when it enacted an amendment (P.A. 01-142, § 8) to § 46b-129 (p) that replaced automatic standing for foster parents in such proceedings with an automatic right to be heard and to comment.

Nothing in the text of § 46b-129 (p), which expressly expands rather than restricts the rights of foster parents within its scope by affording them an automatic right to be heard and to comment, could be understood to prohibit permissive intervention; rather, this court concluded that § 46b-129 (p) clearly and unambiguously guarantees foster parents a right to be heard on the best interests of their foster children in any proceeding under § 46b-129, if they so wish, without the need to request permissive intervention. The trial court deprived the foster parents of their right to be heard and to comment on J's best interest at the revocation hearing by only allowing the foster parents to make a statement at the start of the hearing and then excusing them from the remainder of that hearing.

Regardless of whether a foster parent has been granted intervenor status, under § 46b-129 (p), an eligible foster parent's "right to be heard and [to] comment on the best interests" of his or her foster child in any proceeding under § 46b-129 ordinarily will include the right to be present throughout the proceeding in question and to argue at the appropriate time as to the child's best interest in light of the evidence presented, but the right to be heard and to comment under § 46b-129 (p) does not encompass the right to call or cross-examine witnesses, or to appeal an adverse ruling, which are rights reserved exclusively for the parties to the proceeding.

Nonetheless, under § 46b-129 (p), in implementing the statutory requirements in any particular case, the trial court retains discretion, for good cause shown and within reasonable limits, to broaden or restrict a foster parent's right to be heard if the court concludes that such a modification is necessary to ensure that the proceeding is conducted in a manner that best serves the rights at stake and objectives to be achieved.

*(One justice concurring in part and dissenting in part, with whom another justice joins in part; two justices dissenting in two opinions)*

Argued December 19, 2024—officially released March 21, 2025**

*Procedural History*

Petition, in the first case, by the Commissioner of Children and Families to adjudicate the respondents' minor child neglected, brought to the Superior Court in the judicial district of New Britain, Juvenile Matters, and tried to the court, *Abery-Wetstone, J.*; judgment adjudicating the minor child neglected and committing the minor child to the custody of the commissioner; petition, in the second case, by the foster parents of the minor child for a writ of habeas corpus, brought to the Superior Court in the judicial district of New Britain, Juvenile Matters; thereafter, the court, *C. Taylor, J.*, granted the foster parents' motion to intervene in the first case and their motion to consolidate the cases; subsequently, the court, *C. Taylor, J.*, granted the commissioner's motions for an order that the foster parents be removed as intervenors in the first case and to bifurcate the cases, and the foster parents appealed; thereafter, the foster parents filed a writ of error from, among other orders, an order of the court, *Daniels, J.*, granting the commissioner's motion to revoke the commitment of the minor child. *Reversed*; *writ of error granted in part*; *further proceedings*.

*Brandon B. Fontaine*, with whom was *Meaghan E. Collins*, for the appellants and plaintiffs in error (foster parents).

*Evan O'Roark*, assistant solicitor general, with whom, on the brief, was *William Tong*, attorney general, for the appellee and defendant in error (commissioner).

---

** March 21, 2025, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

*James P. Sexton*, assigned counsel, for the minor child.

*Opinion*

ECKER, J. These appeals concern the legal rights of foster parents to participate, as intervenors or otherwise, in neglect proceedings with respect to the best interest of any child who either is currently living with the foster parents or has been in the foster parents' care within the year prior to the initiation of any such proceeding. The primary issue before us is whether General Statutes § 46b-129 (p)[1] prohibits foster parents from intervening in the proceedings by conferring on them a limited "right to be heard and comment" in the proceedings. We conclude that the statute does not prohibit a trial court from permitting foster parents to intervene in such proceedings.

Jewelyette M., who is now nearly ten years old, was committed to the care and custody of the petitioner, the Commissioner of Children and Families (commissioner), shortly after her birth in June, 2015. When she was two years old, the parental rights of her mother were terminated, and the commissioner placed her with preadoptive foster parents, John N. and Diana N. (foster parents). For the first half of Jewelyette's life, the commissioner's permanency plan called for terminating the parental rights of her father, John M.,[2] and for her adop-

---

[1] General Statutes § 46b-129 (p) provides in relevant part: "A foster parent, prospective adoptive parent or relative caregiver who has cared for a child or youth shall have the right to be heard and comment on the best interests of such child or youth in any proceeding under this section which is brought not more than one year after the last day the foster parent, prospective adoptive parent or relative caregiver provided such care. . . ."

Although § 46b-129 (p) has been amended by the legislature since the events underlying this case; see, e.g., Public Acts 2024, No. 24-126, § 6; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[2] The father, John M., although a respondent in the underlying proceedings, is not a party to this appeal and for convenience is referred to in this opinion as John.

tion. In 2020, the commissioner changed course and decided that Jewelyette should be reunited with John. John thereafter filed a motion to revoke Jewelyette's commitment to the custody of the commissioner. The trial court granted the foster parents' motion to intervene for the purpose of opposing revocation. Following a six day trial on diverse dates in 2022 and 2023, the court, *C. Taylor, J.*, denied the motion to revoke, finding that it was in Jewelyette's best interest to remain with her foster parents.

Soon after the trial court issued its decision in May, 2023, the Appellate Court released its opinion in an unrelated case, *In re Ryan C.*, 220 Conn. App. 507, 299 A.3d 308, cert. denied, 348 Conn. 901, 300 A.3d 1166 (2023), in which the court held that § 46b-129 (p) prohibits foster parents from intervening in neglect proceedings. See id., 518–19, 525–26. The day following the release of the decision in *In re Ryan C.*, the commissioner filed a motion to remove the foster parents as intervenors in the present case. The motion was granted by the trial court. In SC 21055, the foster parents appeal[3] from that decision, claiming that the trial court improperly had removed them under the authority of *In re Ryan C.*, a case they contend misconstrued § 46b-129 (p). We agree that *In re Ryan C.* was incorrectly decided, and must be overruled, because the legislature did not intend § 46b-129 (p) to prohibit a trial court from granting permissive intervention to a foster parent when appropriate. Accordingly, we reverse the judgment of the trial court in SC 21055.

Following the foster parents' removal as intervenors, the commissioner filed a new motion to revoke Jewelyette's commitment, which the trial court, *Daniels, J.*,

---

[3] The foster parents appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

granted after a brief hearing on November 4, 2024, the details of which will be described later in this opinion. In SC 21068, the foster parents claim that the trial court deprived them of their right to be heard in that proceeding under § 46b-129 (p) by not allowing them to be present during the entire hearing or to give sworn testimony, and by requiring them to give any statement at the start of the hearing without hearing the evidence. Because there is a chance the issue could arise on remand, and to prevent further delay in the proceedings, we address this aspect of the foster parents' claim in part III of this opinion. We conclude that a nonintervening foster parent's right to be heard normally will include the right to be present throughout the proceeding and to comment at the appropriate time on the evidence presented to the court.

I

When Jewelyette was born, both she and her mother tested positive for opiates and methadone. Jewelyette's withdrawal symptoms were so severe that she was kept in a neonatal intensive care unit for more than one month. Prior to her release from the hospital, the commissioner sought and obtained an order of temporary custody. Jewelyette was subsequently adjudicated neglected and committed to the commissioner's care and custody. At the time of her commitment, the trial court, *Abery-Wetstone, J.*, found that her father, John, who was then forty-nine years old, had "an extensive criminal history" and "a long-standing, substantial substance abuse history . . . ." (Internal quotation marks omitted.) John also had been "diagnosed with [attention deficit hyperactivity disorder], bipolar disorder, anxiety disorder, cocaine dependency, alcohol dependency and generalized anxiety," as well as "intermittent explosive disorder." (Internal quotation marks omitted.) John was incarcerated for much of Jewelyette's infancy, until she was approximately three years old.

In 2016, the commissioner filed termination of parental rights (TPR) petitions as to both Jewelyette's mother and John, alleging a failure to rehabilitate. On May 18, 2017, the petition was granted as to the mother. Shortly thereafter, Jewelyette was placed in the care of her foster parents, where she remained until July, 2024. When she was four years old, the commissioner's permanency plan recommended the termination of John's parental rights and Jewelyette's adoption. Over John's objection, the trial court, *C. Taylor, J.*, approved that plan, and, on December 9, 2019, the commissioner filed a new TPR petition as to John, alleging a "failure to rehabilitate and acts of commission/omission . . . ."[4]

A trial on that petition was scheduled to begin in March, 2020, but was postponed due to the onset of the COVID-19 pandemic. In August, 2020, the commissioner filed an updated permanency plan, which continued to call for the termination of John's parental rights and for Jewelyette's adoption. John filed an objection to the plan, and, a short time later, the commissioner filed a new permanency plan, this time recommending reunification. Jewelyette's attorney objected to the new plan, and the trial court sustained her objection. In doing so, the court found that "John has never cared for a child of any age. . . . Jewelyette has never been in John's care at any time during her life. . . . John has spent the vast majority of Jewelyette's life of five years and seven months either incarcerated or on parole. Counsel for Jewelyette accurately points out that [the Department of Children and Families (department)] has supplied no therapeutic or scientific evidence to support reunification. There is no credible evidence indicating that [the department] sought any psychological professional's review or insight before deciding that reunifica-

---

[4] The "acts of commission/omission" alleged in the petition referred to a 2019 larceny conviction, which John had failed to disclose to the Department of Children and Families.

tion was appropriate. Under cross-examination by counsel for [Jewelyette], [the department's case worker] admitted that [the department had] failed to seek any update[d] [psychological] evaluation [of John] . . . . [John] has worked hard to accomplish his rehabilitation. However, his own personal rehabilitation does not automatically make him an appropriate parent for Jewelyette."

Thereafter, the department ordered an updated psychological evaluation of John. Following the completion of that evaluation, in 2021, John filed a motion to revoke Jewelyette's commitment, asserting that he had "successfully completed all expectations under his court-ordered specific steps . . . [and that] the court-ordered evaluation supports and recommends reunification . . . ." By this time, Jewelyette was six years old and deeply bonded with her foster parents, whom John had long suspected of turning Jewelyette against him.[5]

---

[5] Stephen M. Humphrey, the clinical psychologist who conducted three psychological evaluations of John in 2017, 2019 and 2021, testified at the 2022 revocation hearing that, during the most recent evaluation, Jewelyette "quite loudly" and repeatedly told John that she did not "want to be around him" or to "live with him." She stated many times "that he's a liar. She [didn't] refer to him by any other name except for that man who lies . . . ." John's attorney asked Humphrey why he thought Jewelyette was "engaging in rejecting behaviors . . . ." Humphrey replied that the level of antipathy Jewelyette exhibited toward John was reminiscent of custody disputes he had seen in family court, in which "a child has developed an utter rejection, an absolute rejection [of] one parent." Humphrey further stated that, "when Jewelyette refers to [John] as a liar, she focuses mostly on one thing, and that is that he has told her that her foster parents aren't her parents, and her foster sister is not her sister. She's . . . confused and disoriented and upset by that." According to Humphrey, Jewelyette's perception of John as a liar "wasn't totally without basis" because, in "her reality, [the foster parents] were her parents . . . . [They were] her parents . . . and to tell her [that they were not was] . . . hurtful to her and beyond her comprehension." Humphrey testified that John's remarks challenged not only Jewelyette's reality, "but one of the most important parts of her reality: who her family [was]." Humphrey ultimately had to stop the 2021 evaluation because of the discord between John and Jewelyette. Humphrey testified that John "didn't have the skill set or the sort of awareness" to control his emotions

In November, 2021, the commissioner notified the foster parents that Jewelyette would be removed from their care in approximately one week's time and placed in the care of John's sister. The foster parents responded by filing (1) an application for a writ of habeas corpus under General Statutes § 52-466 (f),[6] which allows foster parents to seek legal custody of their foster children, (2) an application for a temporary injunction barring Jewelyette's removal from their home until the court ruled on the habeas petition, and (3) a motion to intervene. The trial court granted the temporary injunction, as well as the foster parents' motion to intervene for the limited purpose of opposing the department's permanency plan and John's motion to revoke as contrary to Jewelyette's best interest. Thereafter, the commissioner filed a motion to vacate the temporary injunction, arguing that the foster parents "have and continue to take steps to further damage the relationship between Jewelyette and her biological family and that further time . . . in the home of the [foster parents] runs the risk of irreparably damaging the prospects of reunification." The trial court later consolidated the foster parents' habeas petition with John's motion to revoke and the commissioner's motion to vacate the temporary injunction.

With the foster parents participating as intervenors, a trial on the consolidated matters commenced in April,

around Jewelyette or to refrain from saying things that alienated her. When asked how often in his twenty-seven year career he had been forced to stop an interactional study of a parent and child due to the parent's inability to control himself, Humphrey responded, "I would say I do about forty child protection evaluations [per] year. I would say I have to stop them very rarely, maybe I've done it six or seven times in my career . . . [so] every few years."

[6] General Statutes § 52-466 (f) provides: "A foster parent or an approved adoptive parent shall have standing to make application for a writ of habeas corpus regarding the custody of a child currently or recently in his care for a continuous period of not less than ninety days in the case of a child under three years of age at the time of such application and not less than one hundred eighty days in the case of any other child."

2022. In May, 2022, Jewelyette's attorney of almost seven years, Elizabeth Berman, filed a motion to withdraw as her counsel. Berman informed the court that John's behavior toward her had so "unnerved" her that she did not feel that she could continue representing Jewelyette. Although concerned that Berman's withdrawal would cause a lengthy delay in the proceedings, the trial court reluctantly granted the motion, stating that, while John's behavior was "extremely concern[ing]" and the court was thinking of turning Berman's allegations over to the state's attorney's office, it would have been preferable if Berman had "thicker skin" and remained Jewelyette's attorney.

The trial resumed six months later, in November, 2022. Over the course of six nonconsecutive days, the court heard testimony from numerous witnesses, including Stephen M. Humphrey, the clinical psychologist who conducted psychological evaluations of John in 2017, 2019 and 2021; Haley McDonald, Jewelyette's therapist; and various other social workers, visitation supervisors and department employees familiar with the case. At the conclusion of the evidence, Jewelyette's new attorney, Roger E. Chiasson II, urged the court to deny John's motion to revoke and to grant the foster parents' application for guardianship. Chiasson argued that Jewelyette's foster parents were the only parents she had ever known, that she strongly identified as a member of their family and that removing her from their care could cause irreparable, psychological harm. He further argued that Jewelyette had made it clear to him that she wanted "to be with [her] mommy and . . . daddy and her sister," not with John.

John's attorney countered that Jewelyette's antipathy toward John was the product of the foster parents' influence and that John had done everything the department had asked of him to achieve reunification. Michael J. Besso, the assistant attorney general representing the

commissioner, did not dispute that there was "a lot of evidence about the good relationship between the foster parents and [Jewelyette]. . . . Is that relationship stronger than it is with [John]? Yes, it is. . . . Humphrey notes that. The department recognizes that." He argued, however, that Humphrey had also testified that, although removing Jewelyette from her foster parents' home would present a number of "challenges," removal could be successful with the right psychological supports in place. He further argued that, to defeat the motion to revoke, Jewelyette's attorney and her foster parents had to prove that it would be "detrimental" to Jewelyette to be taken from her foster parents, and no such evidence had been produced. Besso also argued that the evidence strongly suggested that Jewelyette's anxiety and discomfort around John were attributable to her foster parents' influence rather than anything John was doing.

In a memorandum of decision dated May 15, 2023, the trial court denied the motion to revoke. The court began by explaining that the party seeking revocation has the burden of establishing by a preponderance of the evidence that cause for commitment no longer exists; if that burden is met, then the party opposing revocation must demonstrate by clear and convincing evidence that revocation is not in the child's best interest. The court found that, although "John ha[d] resolved some of the issues [that previously] plagued him," his "mental health and parenting issues ha[d] not adequately resolved so as to allow [him] to be a safe, responsible and nurturing father for Jewelyette."

In reaching its determination, the court rejected John and the commissioner's claim that the foster parents were responsible for Jewelyette's negative feelings toward John. The court found "no credible evidence to indicate that anyone [other than John himself had] done anything to alienate Jewelyette from him." The court

further found that, "[d]espite [being given] information concerning the proper way to conduct himself in his visitation with Jewelyette, John . . . insisted on conduct[ing] himself . . . in the manner that he [saw] fit . . . regardless of the harm and anxiety that it cause[d] Jewelyette. His conduct [was] clearly not an appropriate way . . . to treat . . . [an] anxious and fragile child. . . . The record is replete with credible examples of conduct . . . indicating that John ha[d] failed to address his parenting issues." The trial court also credited the testimony of Jewelyette's therapist that Jewelyette recently had informed her "that, if she had to visit John again, she would run into traffic," as well as the testimony of Jewelyette's visitation supervisor and school tutor, who testified that Jewelyette often refused to attend visits with John and would hide from department personnel when they came to take her to visits. In light of the foregoing, the court determined that John "failed to demonstrate that the factors that resulted in his removal as guardian ha[d] been resolved satisfactorily."

Because John had failed to demonstrate that cause for commitment no longer existed, Jewelyette and the foster parents were not required to demonstrate that continued commitment was in Jewelyette's best interest. Nevertheless, "in an abundance of caution," the court proceeded to find by clear and convincing evidence that Jewelyette and the foster parents had established that it was in Jewelyette's best interest to remain with her foster family. The court stated in relevant part: "Jewelyette does not accept John as her parent. She sees the foster parents as her parents. The clear and [convincing evidence] shows that she will never accept John as her parent, regardless of whatever duress is placed [on] her to accept John in that role. The conduct of John has served to alienate Jewelyette from him. [The department] has allowed John to conduct himself

in whatever manner that he wishes . . . during visitation and has done little to correct him, despite the anxiety and discomfort that [his conduct] causes Jewelyette. John shows no prospects of correcting his parenting to an acceptable level. He is hell-bent on parenting in his way, despite the fact that he has never previously raised a child and . . . has been told otherwise. In fact, [the department] has supported his aberrant parenting by removing professionals from the case who dared to dissent." The court concluded: "Jewelyette has experienced anxiety and discomfort in her short life. Her stability and her hope for the future lie in the stable placement that she has with [her] foster family. To remove her from it would be to blight her life in perpetuity."

Two months after the court issued its decision, the Appellate Court released its decision in *In re Ryan C.*, supra, 220 Conn. App. 507. On the basis of that decision, the commissioner filed in the trial court a motion to remove the foster parents as intervenors and to bifurcate the foster parents' habeas petition and the neglect proceeding, which the trial court granted on December 11, 2023. The foster parents filed the present appeal (SC 21055) from the order removing them as intervenors.

In the interim, the commissioner filed a new revocation motion and permanency plan, calling for revocation of Jewelyette's commitment and a transfer of guardianship to John's sister. The case was reassigned to a different judge, and, on July 16, 2024, the trial court, *Daniels, J.*, granted in part the commissioner's ex parte motion for emergency relief to vacate the 2021 injunction preventing Jewelyette's removal from her foster parents' home.[7] Specifically, the court "provide[d] tem-

---

[7] In support of the ex parte motion for emergency relief, the commissioner alleged that, since Judge Taylor's denial of the previous motions to revoke and to vacate the temporary injunction, Jewelyette "has suffered and deteriorated while in the foster home placement." Attached to the motion for emergency relief was a letter written by Juliette Cole, a licensed professional

porary relief from the temporary injunction" by allowing Jewelyette to be placed in the home of her paternal aunt "until such time as the court [could] hold a hearing to consider the request to vacate the temporary injunction . . . ." Jewelyette, who had recently turned nine years old, was removed from her foster parents' home that same day, and, on August 26, 2024, she was placed with John for a trial reunification period. The commissioner then filed an amended permanency plan recommending revocation and a transfer of guardianship to John, rather than to John's sister.

A hearing on the commissioner's motion to revoke was held on November 4, 2024. The hearing was uncontested because the foster parents had been removed as intervenors. Prior to the start of the hearing, the foster parents sought to exercise their right to be heard pursuant to § 46b-129 (p). Their attorney, Rachael M. Levine, argued that, if the right to be heard meant anything, it must, at a minimum, permit foster parents to be present during the hearing and to give a sworn statement at the conclusion of the hearing, after hearing all of the evidence. "[F]or clarity of the record," Levine stated that it was the foster parents' position that "they were wrongfully removed under [In re] Ryan C." and that the trial court should refrain from deciding the commissioner's motion to revoke until after this court released its decision in their appeal from the order removing them as intervenors. The trial court stated its view that the law allowed the court to proceed on the commissioner's motion to revoke notwithstanding the pending appeal and that the foster parents' right to be heard entitled them only to make a statement prior to the

counselor to whom Jewelyette was referred by the department after Judge Taylor denied the first motion to revoke. Cole stated that, "[w]hen I have seen Jewelyette with her [a]unt, [John], [and department] workers, she is smiling, laughing, euthymic, making jokes, and willing to engage. When I have seen Jewelyette with her [f]oster [p]arents . . . Jewelyette is tense, guarded, verbally aggressive, dysthymic, and minimally willing to engage."

start of the hearing. They did so and then were directed to leave.

At the conclusion of the hearing, Jewelyette's attorney, Deetta C. Roncone-Gondek, and guardian ad litem, Martha Stone, both of whom were appointed after the foster parents were removed as intervenors, asked the court to impose a six month period of protective supervision as a condition of revocation, arguing that protective supervision was warranted given Jewelyette's fragile emotional state, John's lack of parenting experience, and the fact that Jewelyette continued to express a desire to return to her foster parents.[8] Roncone-Gondek informed the court that she had visited Jewelyette the night before and that, while Jewelyette previously had expressed a desire to live with John, she spontaneously offered the previous night that she wanted to live with her foster parents, that she preferred their rules to John's, and that she did not like John's house or the fact that he smoked cigarettes. According to Roncone-Gondek, Jewelyette had also stated that, if she could not live with her foster parents, then she preferred to live with her aunt, but, if that were not possible, then she would like to live with John, although she feared he would not let her see her foster parents. According to Roncone-Gondek, Jewelyette informed her that she was "having a hard time because [she] didn't really get to say goodbye to [her foster parents]. It just happened really fast." Jewelyette further stated that she wanted Roncone-Gondek and the department to stay involved in her case. She "appeared anxious at the idea of [the department] and [Roncone-Gondek] not being around."

Roncone-Gondek concluded her remarks by stating: "I think it's clear that the system has failed Jewelyette.

---

[8] At the November 4, 2024 hearing, the guardian ad litem informed the court that Jewelyette "was [in] a psychiatric unit less than [one] week ago. I think she ended up staying overnight there." Jewelyette was taken to the hospital after threatening to kill herself if she was not allowed to return to her foster parents.

I won't remark on who specifically, or how it happened, because I think, quite frankly, we all played a role. We've played a role in that since the inception of this case many, many years ago. I strongly believe and assert that, should this court revoke commitment and close out without a period of [protective supervision], as [the department] is suggesting, that would be failing her once again. We have this threat of litigation constantly hanging over our heads, and we all want to resolve that, but not at the expense of [Jewelyette]. . . . [A]s to the revocation, I will leave that decision to the court's discretion. As Jewelyette's position has continued to vacillate and often vacillates in a single visit, I would ask the court absolutely to order a period of protective supervision should the revocation be granted."

After Roncone-Gondek finished speaking, the trial court found by a preponderance of the evidence that cause for commitment no longer existed, that revocation of commitment was in Jewelyette's best interest, and that guardianship should be transferred to John subject to a six month period of protective supervision (November 4 order). The court then congratulated and complimented John for his persistence, observing that there must have been "plenty of times during the life of this case that you might've been tempted to just throw in the towel, but your perseverance is paying off today."

The foster parents thereafter filed a writ of error (SC 21068),[9] claiming, among other things, that the trial court had violated their right to be heard under § 46b-129 (p) by barring them from the November 4, 2024 revocation hearing and by not allowing them to give sworn testimony. On December 19, 2024, this court heard oral arguments on the foster parents' writ of error

[9] The foster parents brought the writ of error in the Appellate Court, and we transferred the writ to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

and appeal from the order removing them as intervenors.

Approximately three weeks later, John was admitted to the hospital for treatment of an unspecified illness, and he passed away on or about January 21, 2025. On January 23, 2025, the commissioner filed an "ex parte motion to open and modify the disposition of protective supervision and [to] transfer guardianship by agreement" to John's sister. The trial court granted this motion that same day. On January 24, 2025, the commissioner moved to dismiss this appeal and writ of error, arguing that both were moot because there was no practical relief this court could afford the foster parents in light of what the commissioner referred to as the trial court's "interim order" of January 23, 2025, which the commissioner argued "superseded" all previous orders.[10] This court denied the motions to dismiss[11] and, additionally, granted the foster parents' motion to stay the November 4 order until this court decided the merits

---

[10] The commissioner characterized the trial court's January 23, 2025 order as an "interim order" because the trial court ordered a full hearing on the motion, to be held on January 27, 2025, at which the foster parents would be afforded their statutory right to be heard on the proposed modification. See General Statutes § 46b-129 (p). Although it is not clear from the record when the trial court scheduled the January 27 hearing, because the foster parents, by statute, must have an opportunity to be heard in connection with any such motion, we agree with the foster parents that the January 23 order is best understood as an interim order for the paternal aunt to serve as temporary guardian following John's death, until a full hearing on the commissioner's motion to open and modify the judgment could be held.

[11] The commissioner claimed that the foster parents' appeal and writ of error should be dismissed as moot because there no longer was any practical relief this court could afford the foster parents in light of the trial court's January 23, 2025 ex parte order, which the commissioner argued "superseded" the November 4 order revoking commitment. We denied the motions to dismiss on February 6, 2025, for two reasons. First, the ex parte order was an interim and nonfinal order entered ex parte, without a hearing and without evidence. See footnote 10 of this opinion. For that reason alone, it did not moot any aspect of the matters sub judice in this court. The trial court's interim order itself plainly does not moot the appeal because it was entered on a temporary, ex parte basis, without a hearing, without evidence, and without meeting the statutory requirements of § 46b-129 (p). As such, it was neither final nor irrevocable. See, e.g., *Los Angeles County* v. *Davis*,

440 U.S. 625, 631, 99 S. Ct. 1379, 59 L. Ed. 2d 642 (1979) ("jurisdiction, properly acquired, may abate if the case becomes moot because . . . interim relief or events have completely and irrevocably eradicated the effects of the alleged violation [giving rise to the appeal]" (citations omitted)); see also 13B C. Wright et al., Federal Practice and Procedure (3d Ed. 2008) § 3533.1, p. 739 ("when a case remains alive but faces the prospect of imminent mootness . . . [t]he ordinary conclusion is that a suit remains justiciable [even if there is] a strong probability that a mooting event will soon occur"); id., pp. 739–41 n.23 (citing cases); 13B C. Wright et al., Federal Practice and Procedure (Supp. 2011) § 3533.1, p. 54 n.23 (citing cases); cf. *J. Y.* v. *M. R.*, 215 Conn. App. 648, 654, 665–66, 283 A.3d 520 (2022) (disagreeing with defendant's argument that "interim [custody] orders" under *Yontef* v. *Yontef*, 185 Conn. 275, 440 A.2d 899 (1981), were final, as "the [trial] court plainly stated that the interim orders were temporary in nature and that final orders disposing of the initial modification motions were forthcoming").

Second, and more fundamental, the commissioner's motion to open and modify the judgment, even if granted on a noninterim basis, did nothing more than modify the judgment on appeal for the limited purpose of transferring guardianship to John's sister rather than to John himself. That modification does not alter the availability of the relief sought by the foster parents here. In deciding questions of mootness, "there is a substantive distinction between opening a judgment to modify or to alter incidental terms . . . leaving the essence of the original judgment intact, and opening a judgment to set it aside. Under the latter circumstances, the original judgment necessarily has been rendered void and any appeal therefrom would be rendered moot." *RAL Management, Inc.* v. *Valley View Associates*, 278 Conn. 672, 690, 899 A.2d 586 (2006). "[T]he appropriate question is whether the change to the judgment has affected the issue on appeal. If . . . the trial court reverses itself and resolves the matter at issue on appeal in the appellant's favor, it is clear that the appeal is moot as there is no further practical relief that may be afforded. . . . Conversely, if the judgment is opened to address issues entirely unrelated to the appeal, the opening of the judgment has had no effect on the availability of relief. A more difficult question may be presented if the trial court addresses the matter at issue on appeal, but does not entirely afford the appellant the relief sought. In such cases, the extent to which the trial court alters the judgment may require either a new appeal or an amended appeal," which "is [a] fact sensitive" determination. (Citations omitted; internal quotation marks omitted.) Id., 691–92. In comparing a prior and subsequent order for purposes of determining appellate jurisdiction, practical relief remains available when an appeal challenges any portion of the prior order that was not "nullified" or "in any other way vitiated" by the subsequent order. *Thunelius* v. *Posacki*, 193 Conn. App. 666, 686 n.17, 220 A.3d 194 (2019).

The relief sought by the foster parents in this court is reversal of the November 4, 2024 order revoking commitment, restoration of their rights as intervenors, and a new revocation hearing at which they will have the opportunity to present evidence and argument concerning Jewelyette's best interest. If the foster parents were to prevail on appeal (as, it turns out, they do), then the foster parents are entitled to a new revocation hearing

of the foster parents' claims. Additional facts and procedural history will be set forth as necessary.

## II

The foster parents first claim that the trial court improperly removed them as intervenors under the authority of *In re Ryan C.*, which they argue was wrongly decided and should be overruled. The facts of *In re Ryan C.* mirror the facts of the present case. There, the trial court granted the foster mother's motion to intervene for purposes of opposing a motion to revoke the commitment of her foster child, Ryan. See *In re Ryan C.*, supra, 220 Conn. App. 516. After a trial, the court found that revocation was not in Ryan's best interest and granted the foster mother's motion to transfer guardianship of him to her. See id., 517–18. Ryan's father appealed on the ground that the trial court lacked the authority to grant the foster mother's motion to intervene. See id., 518–19, 521–22. The Appellate Court agreed, concluding that, although Practice Book § 35a-4 (c)[12] authorizes the trial court to grant permissive

at which the necessary best interest determination is conducted with the foster parents allowed to participate in accordance with law. There are no findings in the January 23, 2025 order that nullify the trial court's November 4, 2024 findings concerning revocation. Because the trial court did not reverse itself with respect to revocation or otherwise resolve the issue in the foster parents' favor, the foster parents' claims concerning the order are not moot. See *RAL Management, Inc.* v. *Valley View Associates*, supra, 278 Conn. 691–92. It is, of course, true that John is no longer living, but that fact does not alter the legal landscape vis-à-vis the foster parents—the only change is that reversal of the order prior to John's death would have meant that custody of Jewelyette reverted back to the commissioner from John, whereas, now, custody would revert back to the commissioner from the aunt. Justice D'Auria disagrees that John's death did not alter the relief available to the foster parents in this appeal. In his dissenting opinion, Justice D'Auria contends that John's death mooted the foster parents' claims by "irreparably chang[ing] . . . the case in which the foster parents initially sought to intervene." In our view, as we explain more fully in footnote 30 of this opinion, Justice D'Auria's position lacks both legal and factual support.

[12] Practice Book § 35a-4 (c) provides in relevant part: "Other persons unrelated to the child or youth by blood, marriage or law . . . may move to intervene in the dispositional phase of the case, and the judicial authority may grant said motion if it determines that such intervention is in the best

intervenor status to nonrelatives, § 46b-129 (p) pre-
cludes the intervention of nonrelative *foster parents*.
See id., 526–27, citing *In re Shanaira C.*, 297 Conn. 737,
750–53, 1 A.3d 5 (2010); see also *In re Shanaira C.*,
supra, 750 (father's girlfriend was properly granted
intervenor status to oppose revocation of child's place-
ment with biological mother).

In reaching its determination, the Appellate Court
relied principally on a 2001 amendment to General Stat-
utes (Rev. to 2001) § 46b-129 (o) (now subsection (p)).
See *In re Ryan C.*, supra, 220 Conn. App. 523, 525–26.
The court observed that, "[p]rior to the legislature's
adoption of No. 01-142, § 8, of the 2001 Public Acts
(P.A. 01-142), § 46b-129 stated that '[a] foster parent
shall have standing for the purposes of this section in
Superior Court in matters concerning the placement or
revocation of commitment of a foster child living with
such parent.' General Statutes (Rev. to 2001) § 46b-129
(o). Significantly, in 2001, 'standing' was replaced with
'the right to be heard . . . .' P.A. 01-142, § 8." *In re
Ryan C.*, supra, 523. The court reasoned that, "[w]hen
the legislature amends the language of a statute, it is
presumed that it intended to change the meaning of the
statute and to accomplish some purpose. . . . There-
fore, by enacting P.A. 01-142, § 8, the legislature pur-
posefully limited a foster parent's participation in
neglect proceedings to the right to be heard . . . ."
(Citation omitted; internal quotation marks omitted.)

interests of the child or youth or in the interests of justice."

Subsection (d) of that section further provides: "In making a determination
upon a motion to intervene, the judicial authority may consider: the timeli-
ness of the motion as judged by the circumstances of the case; whether the
movant has a direct and immediate interest in the case; whether the movant's
interest is not adequately represented by existing parties; whether the inter-
vention may cause delay in the proceedings or other prejudice to the existing
parties; the necessity for or value of the intervention in terms of resolving
the controversy before the judicial authority; and the best interests of the
child or youth." Practice Book § 35a-4 (d).

Id., 526. The court expressed the view that, because § 46b-129 (p) limits a foster parent's participation in neglect proceedings, that provision must take "precedence over the more general language of Practice Book § 35a-4 [insofar as] § 46b-129 (p) specifically addresses foster parents' rights in neglect proceedings." (Emphasis omitted.) Id.

In this appeal, the foster parents claim that the Appellate Court incorrectly concluded in *In re Ryan C.* that, by changing the word "standing" to "the right to be heard" in General Statutes (Rev. to 2001) § 46b-129 (o), the legislature intended to divest the trial court of its authority to grant foster parents permissive intervenor status under Practice Book § 35a-4. They argue that the legislative history belies any such intent. According to the foster parents, the purpose of the 2001 amendment was merely to conform the language of our juvenile statutes to the federal Adoption and Safe Families Act of 1997 (ASFA), Pub. L. No. 105-89, 111 Stat. 2115, which is widely perceived as having expanded the rights of foster parents, not restricted them. The foster parents also point out that courts that have interpreted "the right to be heard" language at issue have held that a foster parent's right to be heard exists in addition to any right they may otherwise have to intervene.

During oral arguments before this court, the commissioner's counsel conceded that § 46b-129 (p) is ambiguous as to whether it precludes foster parent intervention and that the legislative history cited by the foster parents supports their interpretation of the 2001 amendment. The commissioner argues, however, that *In re Ryan C.* reached the right result, even if it did so for the wrong reason. She contends that the 2001 amendment is "irrelevant" in light of a 2009 amendment to the statute enacting what is now § 46b-129 (d); see Public Acts 2009, No. 09-185, § 3; which, according to the commissioner, "sets forth a comprehensive scheme for inter-

vention in neglect cases" that "plainly and unambiguously reserves intervention for 'any person related to the child or youth by blood or marriage . . . .' " Based on the 2009 amendment, the commissioner proposes that, "[e]ven if the foster parents are right that the 2001 amendment granting them a right to be heard left the door open to permissive intervention, the General Assembly closed that door in 2009 by enacting subsection (d). In other words, it does not matter what certain 2001 legislators thought subsection (p) meant. We know now [as a result of the 2009 amendment] that the legislature . . . wants [only] relatives intervening." As an alternative ground for affirmance, the commissioner argues that, even if we conclude that *In re Ryan C.* was wrongly decided and that subsection (d) does not bar foster parents from intervening, under the circumstances of this case, we should conclude that the trial court abused its discretion in granting the foster parents' motion to intervene.

To the extent this appeal turns on a question of statutory construction under General Statutes § 1-2z,[13] our review is plenary. See, e.g., *131 Beach Road, LLC* v. *Town Plan & Zoning Commission*, 349 Conn. 647, 670, 321 A.3d 382 (2024).

It is undisputed that our rules of practice authorize nonrelatives to intervene in the dispositional phase of juvenile proceedings. Practice Book § 26-1 (m) (3) defines "parties" to a juvenile proceeding to include "any person who is permitted to intervene in accordance with [Practice Book §] 35a-4." Practice Book § 35a-4 (c), in turn, provides that "persons unrelated to

---

[13] "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." General Statutes § 1-2z.

the child or youth by blood, marriage or law . . . may move to intervene in the dispositional phase of the case, and the judicial authority may grant said motion if it determines that such intervention is in the best interests of the child or youth or in the interests of justice." It is well established that a revocation hearing is a dispositional phase of a neglect proceeding. See, e.g., *In re Santiago G.*, 318 Conn. 449, 469–70, 121 A.3d 708 (2015); *In re Shanaira C.*, supra, 297 Conn. 758–59; see also Practice Book § 35a-14A.

Prior to *In re Ryan C.*, we are not aware of any court, party, agency or legislator ever questioning the trial court's authority to grant foster parents permissive intervenor status in the dispositional phase of a neglect proceeding. Indeed, until 2001, what is now § 46b-129 (p) unambiguously granted foster parents *automatic* standing in such proceedings. See *In re Ryan C.*, supra, 220 Conn. App. 525 ("prior to 2001, foster parents historically had standing to intervene"). This court has long held that, in juvenile proceedings, "questions of permissive intervention are committed to the sound discretion of the trial court . . . ." *In re Baby Girl B.*, 224 Conn. 263, 277, 618 A.2d 1 (1992); see also *In re Shanaira C.*, supra, 297 Conn. 744 ("[the father's girlfriend was] properly . . . granted intervenor status . . . for the purpose of . . . exercising her right to oppose the commissioner's motion to revoke"); *In re Vincent D.*, 65 Conn. App. 658, 665–66, 783 A.2d 534 (2001) ("[a]lthough foster or preadoptive parents are barred from intervening in the *adjudicatory* phase of termination proceedings, neither our statutes nor our case law bar[s] such intervention in the *dispositional* phase of such proceedings" (emphasis in original)).

That said, we readily acknowledge that the legislature possesses the authority to enact legislation barring foster parents from intervening. It is well established that "the expectations and entitlements of foster families

can be limited by the state." (Internal quotation marks omitted.) *Hunte* v. *Blumenthal*, 238 Conn. 146, 164, 680 A.2d 1231 (1996); see id. ("[t]he rights of foster parents are defined and restricted by statute"). "[A]lthough [t]he Superior Court is empowered to adopt and promulgate rules regulating pleading, practice and procedure . . . [s]uch rules shall not abridge, enlarge or modify any substantive right . . . ." (Internal quotation marks omitted.) *In re Samantha C.*, 268 Conn. 614, 639, 847 A.2d 883 (2004). Thus, when "a statute creates a substantive right [or prohibition], a conflicting [P]ractice [B]ook rule cannot stand." (Emphasis omitted; internal quotation marks omitted.) Id., 639 n.24. The issue, therefore, is not whether the legislature can prohibit foster parents from intervening in the dispositional phase of a proceeding held pursuant to § 46b-129, thereby nullifying the authority conferred on trial courts in Practice Book § 35a-4 (c). Rather, we must determine whether the legislature has in fact done so via various amendments to that statute.

We begin with the language of the statute. Section 46b-129 (p) provides in relevant part that "[a] foster parent . . . shall receive notice and have the right to be heard for the purposes of this section in Superior Court in any proceeding concerning a foster child living with such foster parent . . . ." For purposes of subsection (p), "this section" refers only to § 46b-129, which governs orders of temporary custody, temporary and permanent legal guardianship, permanency planning and revocation of commitment hearings.

It is not evident to us that, by affording foster parents an automatic right to be heard in neglect proceedings, subsection (p) of § 46b-129 prohibits foster parents from seeking permissive intervenor status to participate as parties in those proceedings. Intervention is not even mentioned in subsection (p), and nothing in the text of the provision can be understood to prohibit interven-

tion. In fact, the express terms of the statute expand rather than restrict the rights of foster parents within its scope (i.e., foster parents whose care of the child is ongoing or occurred not more than one year prior to the proceeding being brought) by providing them with an automatic right to be heard. This is a right that *privileges* foster parents by guaranteeing them a right that most other people—including most family members—do not have. For this reason, the text of subsection (p) does not support a construction that imposes a limitation on the trial court's authority to permit a foster parent to intervene in accordance with Practice Book § 35a-4 (c). In our view, subsection (p) clearly and unambiguously guarantees foster parents a right to be heard on the best interests of their foster children in any proceeding under the statute, if they so wish, without the need to request permissive intervention.

In *In re Ryan C.*, the Appellate Court reached a different conclusion on the basis of the changes implemented by the 2001 amendment. See *In re Ryan C.*, supra, 220 Conn. App. 525–26. As the Appellate Court explained, prior to 2001, what is now subsection (p) of § 46b-129 provided that " '[a] foster parent shall have standing for the purposes of this section in Superior Court in matters concerning the placement or revocation of commitment of a foster child living with such parent.' " *In re Ryan C.*, supra, 523, quoting General Statutes (Rev. to 2001) § 46b-129 (o). In 2001, the legislature replaced "shall have standing" with "shall have the right to be heard  . . . ." P.A. 01-142, § 8. Because standing connotes party status, the Appellate Court reasoned that, by ending foster parents' automatic party status, the legislature must have intended to foreclose the right of foster parents to seek permissive party status, as well. See *In re Ryan C.*, supra, 525–26. Again, we do not agree that, by eliminating *automatic* party status (standing

as of right), it reasonably follows that the legislature intended to end *permissive* intervention, as well.

Although we find the statute unambiguous with respect to this issue, we will nonetheless examine the legislative history for the purpose of responding substantively to, and out of due regard for, the analysis set forth by the Appellate Court in *In re Ryan C.*[14] The limited relevant legislative history of the 2001 amendment refutes the notion that the legislature had any intention of withdrawing the trial court's authority to allow foster parents to intervene in a proceeding within the purview of § 46b-129. When discussing what would later become § 8 of P.A. 01-142, the bill's sponsor, Senator Mary Ann Handley, explained that the proposed amendment "changes the rights of foster parents in permanency hearings and expands the number of interested parties who will be given information about the . . . hearings . . . ." 43 S. Proc., Pt. 6, 2000 Sess., p. 2076. When asked by Senator John McKinney whether the amendment changed the word "standing" to "the right to be heard" to conform the language of General Statutes (Rev. to 2001) § 46b-129 (o) to the federal ASFA,[15] Senator Handley responded that it did. See id.,

---

[14] Although the Appellate Court's decision does not examine whether § 46b-129 (p) is ambiguous, and the court does not otherwise reference the analysis prescribed in § 1-2z, we assume that that court found that § 46b-129 (p) was ambiguous as it relates to intervention because the court delved into the statute's genealogy and legislative history, which it ultimately found dispositive. See *In re Ryan C.*, supra, 220 Conn. App. 525–26.

[15] As originally enacted, the ASFA required states to ensure "the foster parents (if any) of a child and any preadoptive parent or relative providing care for the child are provided with notice of, and an opportunity to be heard in, any review or hearing to be held with respect to the child, except that this subparagraph shall not be construed to require that any foster parent, preadoptive parent, or relative providing care for the child be made a party to such a review or hearing solely on the basis of such notice and opportunity to be heard." Adoption and Safe Families Act of 1997 (ASFA), Pub. L. No. 105-89, § 104 (3), 111 Stat. 2115, 2120 (codified at 42 U.S.C. § 675 (5) (G) (Supp. III 1997)).

p. 2077. Senator McKinney then expressed, "for purposes of legislative intent," his "concern" that the proposed change could be interpreted as "prohibit[ing] a court if it thought it was in the best interest of [the child, from] granting standing to foster parents." Id., p. 2078. Senator Handley responded, "[t]he federal law does not preclude nor does this law preclude foster parents or others having standing if a judge so decides." Id. Senator McKinney responded, "Thank you, Senator Handley. . . . Again, I support this amendment. I just want to [ensure] that should a foster parent believe that there are problems with a permanency plan and [wish] to seek leave of [the] court [to intervene], they have the right to do so and I . . . thank Senator Handley for her help." Id., pp. 2078–79.

The discussion between Senators Handley and McKinney makes two things clear. The 2001 amendment (1) eliminated the automatic standing that foster parents previously enjoyed under General Statutes (Rev. to 2001) § 46b-129 (o), and (2) was not intended to prevent foster parents from seeking permissive intervenor status.[16]

Like Connecticut, many states amended their child protection statutes following passage of the ASFA.[17]

---

[16] Although the discussion between Senators Handley and McKinney took place at the end of the 2000 legislative session, the amendment did not pass until the next legislative session. We do not know the reason for this delay, but the commissioner has not argued that the cited history should be disregarded because of its timing. In fact, the commissioner's counsel acknowledged during oral argument before this court that this legislative history supported the foster parents' interpretation of § 46b-129 (p).

[17] The ASFA was "enacted largely in response to growing criticisms directed at the reasonable [reunification] efforts requirement [of federal law], which included charges that children were . . . in foster homes too long. The charge was that they lingered . . . not because of agency inaction, but because agencies were engaged in excessive efforts to repair hopelessly dysfunctional families. Instead of the permanency intended by the federal reasonable efforts clause, impermanency result[ed]." (Internal quotation marks omitted.) *In re James G.*, 178 Md. App. 543, 575, 943 A.2d 53 (2008). "In 1997, after again looking at the child protection system, Congress sought

See, e.g., *In re Elvin G.*, 310 Conn. 485, 505 n.18, 78 A.3d 797 (2013) (changes made to juvenile statutes after 1998 were "prompted by the federal [ASFA] . . . which set a number of prerequisites for qualification for certain federal funding"); *In re Adoption of Sherry*, 435 Mass. 331, 337 n.5, 757 N.E.2d 1097 (2001) (Massachusetts law requiring that foster parents receive notice and right to be heard "tracks the requirements of the [ASFA] . . . which offers [f]ederal funding to [s]tates in compliance").

Our research has not uncovered any case law from other states interpreting "the right to be heard" language at issue as precluding permissive intervention.[18]

to clarify 'reasonable efforts' and [to] respond to concerns that [earlier laws] had encouraged states to go too far in preserving parent-child relationships that were more harmful than beneficial. It did so in [the] ASFA, primarily by making the child's health and safety 'paramount.' In line with this change, permanency for children moved to the forefront. Under [the] ASFA, children were no longer doomed to spend their years waiting for reunification efforts to make their homes safe. Some situations were exempted from the reasonable efforts requirement, the time period for making reunification efforts was shortened, and adoption was encouraged. If efforts to reunite parent and child were not effective within a limited time, parental rights were to be terminated and adoption sought." Id., 576.

[18] The commissioner contends that "[t]he only relevant sister state authority cuts against the foster parents" and cites four cases that she maintains demonstrate that "[s]ister state courts do not allow foster parent intervention [in the absence of] express statutory authorization." The cited cases, however, do not support the commissioner's argument. To the contrary, in two of the cases, *Roberto F.* v. *Arizona Dept. of Economic Security*, 232 Ariz. 45, 50–51, 301 P.3d 211 (App. 2013), review denied, Arizona Supreme Court, Docket No. 1 CA-JV 11-0253 (October 29, 2013), and *In re Doe*, 134 Idaho 760, 763, 9 P.3d 1226 (2000), the courts applied their respective state's version of rule 24 (b) of the Federal Rules of Civil Procedure. Unlike Practice Book § 35a-4 (c), rule 24 (b) (1) allows permissive intervention only (1) when a statute confers a conditional right to intervene, or (2) when the proposed intervenor's claim or defense and the main action have a question of law or fact in common. See Fed. R. Civ. P. 24 (b) (1) (A) and (B). In *Roberto F.*, the court rejected the foster parents' contention that Arizona's "Foster Parents' Bill of Rights" conferred on them a conditional right of intervention. *Roberto F.* v. *Arizona Dept. of Economic Security*, supra, 50. In doing so the court stated, "[w]e assume that if the legislature had desired to create a right to intervene for foster parents, it would have done so [expressly]." Id., 50–51. The commissioner relies on this language for the

See, e.g., *F.W.* v. *T.M.*, 140 So. 3d 950, 957 (Ala. Civ. App. 2013) ("the plain language of the statute does not prohibit a foster parent from petitioning to intervene in an action before the juvenile court"); *Dept. of Health & Social Services, Office of Children's Services* v. *Zander B.*, 474 P.3d 1153, 1171 (Alaska 2020) ("[w]hen the cautious use of . . . permissive intervention is necessary to promote the child's best interest, the trial court has

proposition that "[s]ister state courts do not allow foster parent intervention [in the absence of] express statutory authorization." In our view, it is more accurate to say that *Roberto F.* and *In re Doe* stand for the proposition that sister state courts *with rules similar to but not coextensive with rule 24 (b) (1)* do not allow foster parent intervention in the absence of express statutory authorization, unless intervention is justified under the common question of law or fact provision. Notably, the court in *Roberto F.* concluded that the trial court did not abuse its discretion in granting the foster parents' request for intervention on the ground that there were common questions of law and fact between the foster parents' termination petition and the dependency proceeding. See *Roberto F.* v. *Arizona Dept. of Economic Security*, supra, 52.

The third case on which the commissioner relies, *In re Interest of Enyce J.*, 291 Neb. 965, 870 N.W.2d 413 (2015), is also distinguishable because, unlike in Connecticut, which "has a unified court system" in which "[a]ll . . . matters"—criminal, civil and juvenile—"fall within the subject matter jurisdiction of the Superior Court"; *State* v. *Angel C.*, 245 Conn. 93, 108 n.17, 715 A.2d 652 (1998); Nebraska's Juvenile Court "is a statutorily created court of limited and special jurisdiction" *that lacks the authority to permit equitable intervention* in any juvenile proceeding. *In re Interest of Enyce J.*, supra, 976–77. Finally, the commissioner cites *In re G.C.*, 558 Pa. 116, 735 A.2d 1226 (1999), which held that a Pennsylvania foster parent lacked standing to seek or contest awards of custody of their foster children. Id., 117. Pennsylvania, however, has a statute expressly providing that only foster parents who have been awarded custody of their foster child have standing to intervene in neglect proceedings. See 42 Pa. Stat. and Cons. Stat. Ann. § 6336.1 (a) (West Cum. Supp. 2024). Connecticut law is different. Like the Nebraska Supreme Court in *In re Interest of Enyce J.*, this court in *Nye* v. *Marcus*, 198 Conn. 138, 139, 502 A.2d 869 (1985), held that foster parents have no standing under Connecticut law to seek custody of their foster children. In response, however, the legislature enacted No. 88-332, § 3, of the 1988 Public Acts (P.A. 88-332), which amended our habeas statute to provide that "[a] foster parent or an approved adoptive parent *shall have standing* to make application for a writ of habeas corpus regarding the custody of a child currently or recently in his care . . . ." (Emphasis added.) P.A. 88-332, § 3, codified as amended at General Statutes § 52-466 (f). In light of the foregoing, we are not persuaded that the out-of-state cases relied on by the commissioner carry any weight in this case.

the discretion to employ it"), overruled in part on other grounds by *Blythe P.* v. *Dept. of Health & Social Services, Office of Child Services*, 524 P.3d 238 (Alaska 2023); *Schubert* v. *Arkansas Dept. of Human Services*, Docket No. CA 09-695, 2010 WL 374183, *3 (Ark. App. February 3, 2010) (state law modeled after ASFA does not preclude foster parent intervention); *State ex rel. C. H.* v. *Faircloth*, 240 W. Va. 729, 737, 815 S.E.2d 540 (2018) ("What [West Virginia case law] properly illustrates is that the right to be heard afforded under West Virginia Code § 49-4-601 (h) exists and operates independently of the rights and privileges afforded to intervening parties. Foster parents and others designated in the statute have a right to be heard without the necessity of requesting intervenor status. We find nothing, however, in [this statute that] *precludes* foster parents from likewise procedurally being granted party-intervenor status [when] appropriate." (Emphasis in original.)).[19]

The commissioner contends that, even if subsection (p) of § 46b-129 does not preclude foster parent intervention, subsection (d) of that statute does so. That

---

[19] Numerous states have statutes expressly authorizing foster parent intervention in neglect proceedings. See, e.g., *A.M.* v. *A.C.*, 296 P.3d 1026, 1031 (Colo. 2013) (Colorado statute "provides for intervention [in the dispositional phase of a neglect proceeding] by certain individuals who . . . (1) have the child in their care for more than three months; and (2) have knowledge or information concerning the care and protection of the child"); *In re E.G.*, 738 N.W.2d 653, 655 (Iowa App. 2007) (under § 232.91 (2) of 2005 version of Iowa Code, "[a] foster parent 'may petition the court to be made a party' to juvenile proceedings"); *In re Kimberly J.*, 191 App. Div. 2d 984, 984, 595 N.Y.S.2d 146 (1993) (§ 383 (3) of New York Social Services Law authorizes foster parent intervention in " 'any proceeding involving the custody of the child' "); *Cooper* v. *South Carolina Dept. of Social Services*, 428 S.C. 402, 412, 835 S.E.2d 516 (2019) (foster parents have statutory right to intervene in neglect proceedings); *In re N.L.G.*, 238 S.W.3d 828, 830 (Tex. App. 2007) (same). To our knowledge, only Nebraska categorically prohibits foster parent intervention in neglect proceedings. See *In re Interest of Enyce J.*, 291 Neb. 965, 976–77, 870 N.W.2d 413 (2015); see also footnote 18 of this opinion.

subsection provides in relevant part: "(1) (A) If not later than thirty days after the preliminary hearing, or within a reasonable time when a relative resides out of state, the Commissioner of Children and Families determines that there is not a suitable person related to the child or youth by blood or marriage who can be licensed as a foster parent or serve as a temporary custodian, and the court has not granted temporary custody to a person related to the child or youth by blood or marriage, any person related to the child or youth by blood or marriage may file, not later than ninety days after the date of the preliminary hearing, a motion to intervene for the limited purpose of moving for temporary custody of such child or youth. If a motion to intervene is timely filed, the court shall grant such motion except for good cause shown. . . ." General Statutes § 46b-129 (d). The commissioner argues that, because § 46b-129 (p) confers on a particular class of persons a right to participate in a neglect proceeding in one manner or one context, the provision therefore must impliedly bar participation in any other manner or context. Thus, according to the commissioner, subsection (p) provides foster parents the right to be heard in any proceeding under § 46b-129, and, therefore, they have no ability to intervene in those proceedings; similarly, subsection (d) provides that, under certain circumstances, relatives of the child may intervene for the purpose of obtaining temporary custody within ninety days of a preliminary hearing on a petition alleging that a child is neglected, uncared for or abused, and, therefore, foster parents are not permitted to intervene at any time in any proceeding brought under § 46b-129.

The commissioner's reliance on subsection (d) of the statute fails for the same reason that her claim that subsection (p) bars foster parent intervention fails. Specifically with respect to subsection (d), the fact that the provision grants a child's relatives the right to inter-

vene for the purpose of seeking temporary custody in the earliest stages of a case when no suitable custodian has been identified in no way suggests or implies that, at a later stage in the process, a foster parent may not intervene in the proceeding for some other purpose.

We see nothing in the text of § 46b-129 (d), whether viewed alone or in combination with other statutes, to support the commissioner's sweeping assertions that it (1) "plainly and unambiguously reserves intervention for 'any person related to the child or youth by blood or marriage,' " (2) evinces a legislative intent to exclude "all others—including nonrelative foster parents—from seeking intervention," or (3) "established for the first time a scheme controlling intervention in neglect cases." In our view, subsection (d) is concerned only with the expeditious placement of children with family members at the outset of proceedings under the statute. It does not provide a blanket revision or modification of the rules of permissive intervention in connection with neglect proceedings generally.[20]

Accordingly, we conclude that § 46b-129 does not bar a trial court from granting a foster parent's request for permissive intervention in the dispositional phase of a neglect proceeding. Contrary to the determination of the Appellate Court in *In re Ryan C.*, there is no conflict between § 46b-129 and Practice Book § 35a-4 (c). Practice Book § 35a-4 (c) permits our trial courts to grant permissive intervenor status to any person, so long as the court determines that it is in the child's best interest

_____

[20] Even if the statute were ambiguous on this point, a characterization we reject, we believe that the legislative history of § 46b-129 (d) erases any doubt as to its meaning. See, e.g., 52 H.R. Proc., Pt. 19, 2009 Sess., p. 6066, remarks of Representative Karen M. Jarmoc ("this bill requires courts to look for a suitable caretaker relative, and when we say that we mean someone who is related by blood or marriage . . . [i]n the early stages of cases [in which] children have been or are at risk of being removed from the home due to allegations of abuse or neglect"); id., pp. 6070–71, remarks of Representative Jarmoc ("'[this legislation] requires the [d]epartment . . . [to] consider . . . a relative caregiver early and consistently'").

to do so.[21] To the extent *In re Ryan C.* holds otherwise, it is hereby overruled.[22]

Because we conclude that the foster parents were improperly removed as intervenors, their rights as inter-

[21] The commissioner argues throughout her brief that, as a matter of public policy, foster parents should be prohibited from intervening in neglect proceedings. It is axiomatic that policy decisions of this nature are left to the legislature, not this court. What is clear, however, is that the legislature has historically exhibited a strong policy preference for giving foster parents, even former ones, a prominent voice in these proceedings. See 41 S. Proc., Pt. 8, 1998 Sess., pp. 2456–57, remarks of Senator M. Adela Eads (Discussing No. 98-185 of the 1998 Public Acts, a predecessor to P.A. 01-142, the senator stated: "This bill extends the right of [former] foster parents by permitting them to comment on the best interests. . . . [I]t gives the person who has invested a great deal of love, and affection, with this child, and who knows this child better than any social worker or the [department] people, to be able to have a say in the [placement] of the child."); see also *In re Adoption of Sherry*, supra, 435 Mass. 338 ("Because foster parents often possess the most detailed and the most current information available [about a child], the [l]egislature had good reason to permit them to be heard [on these matters]. The best interests of the child are served by ensuring that judges have all the relevant information about the child at their disposal before making such important decisions."). We trust our trial courts will continue to make appropriate decisions when it comes to requests for intervention, guided always by the child's best interest and the factors set forth in Practice Book § 35a-4 (d). We are confident that our courts exercise their discretion in this area cautiously and with a great deal of sensitivity.

In this regard, contrary to the assertion in Judge Elgo's dissenting opinion, the "interest" of the foster parents when seeking permissive intervention is not their interest in pursuing their own desire to obtain or extend their status as caregiver and custodian of the child but, rather, their unique interest in seeing that the future welfare of the child that they have lived with, cared for, and loved for a long time is placed into the hands of the person(s) best equipped to ensure the best interest of the child. As the commissioner acknowledged in her brief opposing intervention in the trial court: "Regarding the proposed intervenors interest in the case, it cannot be denied that they have an interest in Jewelyette's care." It is precisely because of the unique knowledge and perspective possessed by the foster parents in some cases that the interests of a foster parent will not necessarily be adequately represented by the existing parties.

[22] As an alternative ground to affirm the trial court's order removing the foster parents as intervenors, the commissioner argues that the trial court abused its discretion in granting the foster parents' motion to intervene because "intervention transformed the case into a custody battle [between the foster parents and] John . . . and led the court to improperly compare them to one another." We agree with the foster parents that the commissioner's alternative ground for affirmance is an improper attempt to raise an unpreserved legal claim concerning the 2023 revocation decision by dressing the claim as a challenge to the court's discretionary ruling on intervention

venors must be restored and the case must be remanded for a new revocation hearing.[23] See, e.g., *Reilly* v. *State*, 119 Conn. 217, 221, 175 A. 582 (1934) ("the effect of a reversal is to destroy the judgment in that action, to restore the parties to the position in which they were before the judgment was rendered, and to permit the [reentry] of the case in the trial court for disposition as though no judgment had been [rendered]"); *Mulholland* v. *Mulholland*, 31 Conn. App. 214, 219, 624 A.2d 379 (1993) ("appellate reversal restore[s] the parties to the position in which they were before the judgment was rendered" (internal quotation marks omitted)), aff'd, 229 Conn. 643, 643 A.2d 246 (1994); see also *In re Shanaira C.*, supra, 297 Conn. 762–63 (reversing judgment and remanding case for new revocation hearing when trial court improperly had limited intervenor's right to participate at hearing); *In re Nasia B.*, 98 Conn. App. 319, 329–30, 908 A.2d 1090 (2006) (reversing judg-

made eighteen months prior to the revocation decision. The commissioner never raised this claim of error in the trial court, either as a ground in opposition to intervention or later as a basis to remove the foster parents as intervenors. During oral argument on the motion to intervene, the commissioner's counsel argued that, although the foster parents had no standing to intervene as a matter of right, the trial court had discretion under Practice Book § 35a-4 to grant them permissive intervention. At that time, the commissioner argued that the court, in the exercise of its discretion, should deny intervention because, among other reasons, the foster parents' concerns were adequately represented by Jewelyette's counsel, who also opposed revocation and would likely call the foster parents as witnesses, which would give them an opportunity to be heard on the matter. The commissioner did not claim that intervention should be denied because it would require the trial court to engage in an improper comparison between the foster parents and John.

Our rules of practice vest the trial court with discretion to grant permissive intervention. Because the commissioner never raised in the trial court the discretionary consideration that is now raised on appeal as an alternative ground for affirmance, "[w]e cannot determine whether the trial court abused an exercise of discretion that it neither made nor was asked to make. Under these circumstances, we decline to review the [commissioner's] unpreserved claim." *State* v. *Fernando V.*, 331 Conn. 201, 213, 202 A.3d 350 (2019).

[23] On remand, nothing in this opinion should be read as prohibiting the commissioner from filing a new motion to remove the foster parents as intervenors. See, e.g., Practice Book § 35a-4 (f).

ment and remanding case for new revocation hearing when trial court had violated foster parent's right to be heard). In reaching this conclusion, we are acutely aware that much has happened in the more than eight months since Jewelyette was removed from her foster parents' home. John's death doubtlessly has compounded the pain, dislocation and uncertainty she experienced as a result of the changes imposed since last summer, and even prior to that time. What is in Jewelyette's best interest now may have changed from what was in her best interest in 2023, or last year, and the focus of any new dispositional hearing must be on her status and her best interest at the time of that hearing.[24]

## III

Because the issue could arise again on remand, and to prevent any further delay in those proceedings, we will address the foster parents' claim in SC 21068 that the trial court deprived them of their right to be heard under § 46b-129 (p) by, among other things, not allowing them to be present during the November 4, 2024 revocation hearing.

The following additional facts and procedural history are relevant to this claim. At the start of the November 4, 2024 hearing, counsel for the foster parents argued that her clients' right to be heard under § 46b-129 (p) included the right to remain in the courtroom for the duration of the hearing and to give a sworn statement after the presentation of evidence. "As we sit here today," she argued, "with [the] extremely limited information that we have, [the foster parents] anticipate that

---

[24] At oral argument before this court in December, 2024, Jewelyette's appellate counsel and guardian ad litem represented that Jewelyette had decided sometime in November that she wished to live with John. The record also reveals, however, that, as recently as early November, according to Jewelyette's trial counsel and guardian ad litem, Jewelyette continued to vacillate on this question and, on more than one occasion, threatened to harm herself if she was not allowed to return to her foster parents.

they would object to the revocation of commitment, but, [without] the benefit of [knowing] all the evidence, [they cannot take a fully] informed position . . . ." Counsel further argued that allowing the foster parents to be present for the hearing protected not only their right to be heard and to comment on Jewelyette's best interest, but also served Jewelyette's right to have before the court the fullest, most accurate picture concerning that issue.

The trial court responded that the foster parents should have received a copy of the motion to revoke and the revocation study, and, therefore, their claim of being uninformed was "not entirely accurate . . . ." The court further stated: "I'm not sure, given the current procedural posture of this case, that [the foster parents] necessarily enjoy the rights afforded foster parents. Nonetheless, the court is extending to them that right to be heard, even though, in their current legal status, they are not currently and have not been for several months the foster parents of [Jewelyette]." The court further stated that, although the court was aware that the foster parents were appealing from the order removing them as intervenors, the removal order was "based [on] the law [in *In re Ryan C.*] as it exists today. Certainly . . . allowing them to be heard, either at the start of this hearing or [at] the conclusion of the hearing . . . satisfies the spirit of their right to be heard with regard to best interest." The court continued: " I think, at this point . . . it's quite clear to everybody what the [foster parents'] position is vis-à-vis the motion before the court this morning. I don't think that comes [as] any great surprise. Nonetheless, I am going to give them the right to be heard. I'm going to allow them to make a statement, and then [I] will excuse them. I . . . think that . . . that certainly affords them the rights that they are provided under the law. But it also respects the fact that, as nonparties, the balance of this proceeding

is confidential, and I don't see that they have the right to participate in the balance of the proceeding."

After the court finished speaking, the foster parents, through their attorney, made the following statement: "[For nearly seven years, the foster parents] provided the day-to-day care [for] Jewelyette and parented her as their own. . . . In July of 2024, after being removed, the department required that all [their] contact with Jewelyette be supervised, despite [their] years as licensed foster parents, a license which remains current. . . . Jewelyette has considered [them] her mother and father for several years and continues to see them this way, to this very day. [The foster parents] also have another daughter . . . who Jewelyette considers to be her sister.

"Since the removal, the [foster parents] have had approximately five in-person visits with Jewelyette . . . . During the in-person visits, Jewelyette runs to [them] to embrace them, asking when she can return home. At the end of [the] visits, Jewelyette struggles to leave [them], often crying, reaching out to them and not understanding why she can't return to their home. The removal in July was based on an ex parte motion filed with this court, which included a statement provided by [Jewelyette's current] therapist," Juliette Cole, who "opined that Jewelyette was suffering from Stockholm syndrome, a diagnosis not recognized by the [fifth edition of the Diagnostic and Statistical Manual of Mental Disorders]." Counsel argued that it was outrageous to suggest that Jewelyette's love for her foster parents was similar to the feelings a captive may develop for her captors. "Outside of this outrageous idea that foster parents . . . are somehow akin to kidnappers, the continued love and desire that Jewelyette has for [her foster parents constitute] evidence that there is a true bond between them. . . . Jewelyette's attorney has made it clear on several occasions that Jewelyette continues to

view [her foster parents] as her mom and dad and wishes to have contact with them going forward.

"In May of 2023, there was a decision . . . by Judge . . . Taylor, [who] found that [John] had not rehabilitated and that cause for commitment still existed. To the [foster parents'] knowledge, there has been no substantial change in this case since the hearing that resulted in that decision. Rather, on the same evidence, less . . . evidence [in fact] . . . the department is asking a different trier of fact [to] make the opposite finding and [to] revoke commitment [and to place] Jewelyette [with John].

"Based on the limited information available to the [foster parents] and their interactions with Jewelyette regarding her expressed desires, the [foster parents] object to the revocation of commitment and ask this court to fully assess how [John] has rehabilitated, since May, 2023, [when] the court found he had not [rehabilitated]." Counsel also reiterated the foster parents' request that the court refrain from making any decision on the motion to revoke while their appeal from the order removing them as intervenors was pending.

After the foster parents were excused from the hearing, the court asked the parties how it should proceed given that there was no written objection to the motion to revoke. Jewelyette's counsel responded that the matter was not as straightforward from her perspective because Jewelyette continued to "waffle" on the issue of revocation and continued to express a desire to live with her foster parents. She further stated that, "at [a] minimum, we should . . . put on the social worker and allow for questioning, just to make the record very clear on where things were at and how we got here." The court agreed, stating that, given the nature of the proceeding, it made sense to "put the [commissioner] through the paces of calling a witness and making [her]

case," even if there was no formal objection to the motion. The assistant attorney general responded that she had not prepared any witnesses because she thought the matter was uncontested. She further argued that Jewelyette's wishes with respect to the foster parents were irrelevant. John's attorney similarly argued: "Your Honor, can I just ask, I get, you know, Jewelyette's position. However, I think we should all be [cognizant] that we are in child protection court, and I have never in [my] twenty plus years had a case determined solely by . . . [a] nine year [old's] wishes."

The court ordered a recess until the afternoon, when the commissioner presented the testimony of department social worker Ashley Cotto, a strong proponent of reunification with extensive knowledge of the case. Cotto, who had authored the revocation study, testified regarding the various steps John had completed over the years to achieve reunification, as well as the services he and Jewelyette were receiving to assist them in this regard. Cotto testified that Jewelyette was presently living with John for a trial reunification period and described John's and Jewelyette's daily routines and the supports in place to facilitate their reunification. In response to questioning, Cotto acknowledged that the "trial home visit has not been without some struggles," which she explained mainly concerned Jewelyette's desire to be with her foster parents. When asked to elaborate, Cotto described an incident during which "Jewelyette reported that she wanted to harm herself if she was not able to go back to [her foster parents' house]," and her therapist had thought it best that she not return to John's house that evening. She further testified that Jewelyette's therapist, Cole, attributed Jewelyette's "dysregulation" to having contact with the foster parents. According to Cotto, "Jewelyette struggles . . . after her visit [with them], prior to her visit, and it takes her a few days [after her visit] for her

behavior, I want to say, to go back to normal. After her visit, she'll be really dysregulated. [She'll tell John], you know, you're not my real dad; [my foster father is] my real dad."

At the conclusion of the hearing, the trial court found by a preponderance of the evidence that cause for commitment no longer existed, that revocation of commitment was in Jewelyette's best interest, and that guardianship should be vested in John subject to a six month period of protective supervision.

The foster parents argue on appeal that, for the right to be heard conferred by § 46b-129 (p) to be meaningful, foster parents must have timely notice of and adequate information about the evidentiary bases for any proceeding to which the right to be heard attaches, and must be permitted to attend that hearing and to comment on the child's best interest after observing the evidence and arguments presented. The commissioner responds that nothing in the text of § 46b-129 (p) supports the foster parents' claim that their right to be heard includes a right to attend the hearings in question, which, the commissioner argues, could raise potential confidentiality concerns. The commissioner asks this court to hold "that trial courts may, in their sound discretion, decide on a case-by-case basis when to take foster parents' statements," and that the level and type of participation that foster parents are allowed with respect to a given hearing are within the sound discretion of the trial court.

This court has yet to consider the meaning of the right to be heard under § 46b-129 (p). The statute itself does not define or otherwise delineate the contours of that right. It simply provides, in relevant part, that "[a] foster parent . . . who has cared for a child or youth shall have the right to be heard and comment on the best interests of such child or youth in any proceeding

under this section which is brought not more than one year after the last day the foster parent, prospective adoptive parent or relative caregiver provided such care. . . ." General Statutes § 46b-129 (p). We conclude that the meaning of the statutory "right to be heard" is ambiguous as applied to the facts of this case. Based on the legislative history, however, we are aware that foster parents are not made parties to a neglect proceeding by virtue of the rights conferred on them by § 46b-129 (p). Accordingly, the right to be heard does not encompass the right to call or cross-examine witnesses, or to appeal an adverse ruling, which are rights reserved exclusively for parties. See, e.g., *In re Santiago G.*, 325 Conn. 221, 229, 157 A.3d 60 (2017) ("[t]he statutory right to appeal is limited to appeals by aggrieved parties from final judgments" (internal quotation marks omitted)); *State ex rel. H.S.* v. *Beane*, 240 W. Va. 643, 649, 814 S.E.2d 660 (2018) (nonintervening foster parents' right to be heard did not include right to cross-examine witnesses); *In re C.H.*, 115 N.E.3d 244, 246 (Ill. App.) ("[t]he right to be heard does not afford [foster parents] party status or the right to appeal the trial court's ruling"), appeal denied, 106 N.E.3d 1036 (Ill. 2018).

On the other hand, the right to be heard is not a trivial entitlement in this context and should be understood to be significant and meaningful. See, e.g., *State ex rel. H.S.* v. *Beane*, supra, 240 W. Va. 649 (foster parents' right to be heard includes "[the right to be] informed of the evidence presented during the . . . hearing" and "most certainly . . . a right to be heard on these issues in a meaningful way," and "[the] lack of information about the [family members'] motion [for custody and visitation] deprived the [foster parents] of a meaningful opportunity to be heard"); cf. *Mathews* v. *Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976) ("[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a

meaningful manner" (internal quotation marks omitted)).[25] We are persuaded that the right to be heard and to comment on the best interest of a child in a proceeding concerning the child's placement must at the very least include, in the normal course, the right to be present throughout the proceeding in question and to argue at the appropriate time as to the child's best interest in light of the evidence presented relating to that issue.[26]

The commissioner argues that interpreting the right to be heard to encompass a right to be present throughout the proceeding runs afoul of the confidentiality provisions of General Statutes §§ 46b-122 and 46b-124. We disagree. To begin with, the applicable confidentiality provisions are always subject to exception, even with respect to persons having no statutory right to participate in the proceeding. Section 46b-122 (c) provides in relevant part that "[a]ny judge hearing a juvenile matter, in which a child is alleged to be uncared for, neglected, abused or dependent or in which a child is the subject of a petition for termination of parental rights, may permit any person whom the court finds has a legitimate interest in the hearing or the work of the court to attend such hearing. . . ." Section 46b-122 (d) further provides in relevant part that "[n]othing in this section shall be construed to affect . . . the right of foster parents to be heard pursuant to subsection (p) of section 46b-129." We understand subsection (d) to mean that the trial court's discretionary authority

[25] The right at stake in the present case is a statutory one and does not originate in the due process clause. Nonetheless the statutory "right to be heard" unmistakably echoes the familiar "opportunity to be heard" integral to the due process right, and it is sensible to construe the statutory right to require that the right to be heard be meaningful.

[26] As we explain more fully hereinafter, the standard we announce today is not absolute, and the trial court has discretion to modify these procedures for good cause in light of the particular circumstances of any given case.

under subsection (c) cannot be exercised so as to impair a foster parent's right to be heard under § 46b-129 (p).

As for juvenile court records, § 46b-124 (b) authorizes the trial court to order the disclosure of any juvenile record;[27] the trial court in the present case acted in conformity with this provision when it ordered that the foster parents be provided with copies of the motion to revoke and the revocation study prior to the November 4, 2024 hearing. We imagine that most foster parents eligible to exercise their right to be heard under § 46b-129 (p) are already intimately familiar with the contents of their foster child's juvenile records by virtue of having cared for the child over the course of many months or years. To the extent they are not, the trial court has ample tools at its disposal to protect the confidentiality of these records that do not require the removal of the foster parents from the hearing. See, e.g., General Statutes § 46b-122 (c) ("[t]he court may, for the child's safety and protection and for good cause shown, prohibit any person or representative of any agency, entity or association, including a representative of the news media, who is present in court from further disclosing any information that would identify the child, the custodian or caretaker of the child or the members of the child's family involved in the hearing").

We attach an important caveat to the foregoing framework. Although we hold that the right of eligible foster parents to be heard under § 46b-129 (p) ordinarily will include the right to be present throughout the proceeding in question, and to argue at the appropriate time as to the child's best interest in light of the evidence, in

---

[27] With exceptions inapplicable to this appeal, § 46b-124 (b) provides in relevant part that "[a]ll records of cases of juvenile matters, as provided in section 46b-121, except delinquency proceedings, or any part thereof . . . shall be confidential and for the use of the court in juvenile matters, and open to inspection or disclosure to any third party . . . only upon order of the Superior Court . . . ."

implementing the statutory requirements in any particular case, the trial court retains discretion, for good cause shown and within reasonable limits, to broaden or restrict a foster parent's right to be heard if the court concludes that such a modification is necessary to ensure that the proceeding is conducted in a manner that best serves the rights at stake and objectives to be achieved.[28] See, e.g., *In re Adoption of Sherry*, supra, 435 Mass. 338 n.6 ("[w]e leave it for the trial court to determine the best procedure for the exercise of [the foster parents'] right [to be heard]"); *In re H.W.*, 247 W. Va. 109, 120, 875 S.E.2d 247 (2022) ("[t]he level and type of participation in such cases is left to the sound discretion of the [trial] court with due consideration of the length of time the child has been cared for by the foster parents and the relationship that has developed").

## IV

Judge Elgo's dissent consists primarily of policy arguments that are neither embodied in the statutory text nor found in the legislative history of § 46b-129 (p) or any other relevant law. Specifically, she argues that our construction of § 46b-129 (1) threatens "the fundamental substantive due process rights that biological parents have in family integrity"; part I of Judge Elgo's dissenting opinion; (2) "invites trial courts to make . . . improper and unconstitutional comparison[s]" between natural and foster parents; part II of Judge Elgo's dissenting opinion; (3) could result in unnecessary delays in dispositional phase proceedings; and (4) possibly could "be viewed as an impediment to reunification, [which] risks undermining the option of termination of

---

[28] Subject to the discretion of the trial court, and when circumstances warrant, such modifications may include, for example, allowing nonintervening foster parents to present otherwise admissible documentary evidence in support of their position or precluding foster parents from hearing or viewing particular evidence when the need for confidentiality outweighs their right to comment on that evidence.

parental rights and adoption of a child" under General Statutes § 17a-112 (k) (4), insofar as that statute requires the court to consider " 'the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by . . . the unreasonable act of any other person . . . .' " Part III B of Judge Elgo's dissenting opinion. We disagree with each of these contentions.

With respect to Judge Elgo's assertions that our construction of § 46b-129 "wholly ignores a biological parent's substantive due process right to family integrity"; part II of Judge Elgo's dissenting opinion; we observe, first of all, that she does not cite a single case—from Connecticut or any other state—that supports the view that allowing permissive intervention by foster parents in the dispositional phase of a neglect proceeding implicates (much less threatens to infringe) a biological parent's constitutional rights. Indeed, this court has long recognized the authority of trial courts to grant this type of intervention. See part II of this opinion (citing cases).

This court has said repeatedly that, "[w]hile the rights of parents qua parents to the custody of their children is an important principle that has constitutional dimensions . . . [those] rights are not absolute. We [have] reject[ed] the claim of the so-called parental rights theory under which the parent has rights superior to all others except when he is proved unfit." (Citations omitted; internal quotation marks omitted.) *In re Juvenile Appeal (Anonymous)*, 177 Conn. 648, 661, 420 A.2d 875 (1979). "We have consistently held in matters involving child custody that while the rights, wishes and desires of the parents must be considered it is nevertheless the ultimate welfare of the child [that] must control the decision of the court. . . . In fact, the best interest of the child standard is implicitly incorporated into the commitment statute . . . which authorizes the Juvenile Court to commit the custody of a child to another

if it finds that the child needs the care, discipline or protection of the state." (Internal quotation marks omitted.) *In re Ava W.*, 336 Conn. 545, 570, 248 A.3d 675 (2020).

In this regard, it bears repeating that, under our statutory scheme, intervention is permitted only during the dispositional phase of a neglect proceeding, the focus of which is exclusively on the best interest of the child, which often may diverge from that of the parent, particularly when the child has lived apart from the parent for a significant period of time.[29] See, e.g., *In re Natalie*

[29] All of the cases on which Judge Elgo relies in support of her contention involve a nonparent's attempt to intervene *as a matter of right*, usually in the *adjudicative* phase of a termination of parental rights proceeding. In such cases, we have held that foster parents have no constitutional standing to intervene because, unlike natural parents, they have no liberty interest in the integrity of their family units. See, e.g., *Hunte* v. *Blumenthal*, supra, 238 Conn. 164. Judge Elgo's contention overlooks the fundamental distinction we have drawn in these same cases between the adjudicative and dispositional phases of a neglect proceeding as the proceeding relates to *permissive intervention.* To reiterate, this court has held that intervention is prohibited in the adjudicative phase of a termination proceeding because "termination of parental rights proceedings concern *only* the rights of the respondent parent" and not those of the child; (emphasis in original) *In re Santiago G.*, supra, 325 Conn. 234; and "[i]t is . . . essential . . . to sever completely the issues of whether termination is statutorily warranted and whether a proposed adoption is desirable." *In re Juvenile Appeal (Anonymous)*, supra, 177 Conn. 673. We have held, therefore, that, "[a]lthough petitions for termination are presumably seldom brought unless prospective adoptive parents are available, there still must be a [two step] process to determine, first, the threshold question of whether cause for termination under [General Statutes § 17a-112] has been proved. The best interests of the child, as such, [are] not . . . [grounds for termination] and [are] not involved in this threshold question." (Internal quotation marks omitted.) Id. It simply does not follow that foster parent intervention is prohibited at the dispositional phase, when the best interest of the child becomes the paramount consideration. To the contrary, we have repeatedly held that permissive intervention is permitted in the dispositional phase of a neglect proceeding, including the dispositional phase of a termination proceeding, because the focus at that stage is exclusively on the welfare of the child. See, e.g., *In re Baby Girl B.*, supra, 224 Conn. 277 ("[w]hen the issue is the validity of the termination of a parent's rights to her child . . . we continue to adhere to the sharp line drawn between the adjudication of termination of parental rights and the future disposition of the child for purposes of determining whether foster or preadoptive parents are entitled to intervene"); *In re Vincent D.*,

*S.*, 325 Conn. 833, 847, 160 A.3d 1056 (2017) ("[i]t is axiomatic that, once a child has been adjudicated neglected, the dispositional decision must be based on the best interest of the child and that the interest of the child and the parent may diverge"). In determining best interests, the trial court acts well within its authority to consider the stability and well-being a child has achieved in his or her current placement and the impact returning the child to a biological parent could have on the child's emotional, physical and psychological well-being.[30] See *In re Juvenile Appeal (Anonymous)*, supra,

supra, 65 Conn. App. 665–66 ("[a]lthough foster or preadoptive parents are barred from intervening in the adjudicatory phase of termination proceedings, neither our statutes nor our case law bar[s] such intervention in the dispositional phase of such proceedings" (emphasis omitted)).

[30] In support of his view that the trial court's January 23, 2025 interim order mooted the foster parents' claims, Justice D'Auria contends in his dissenting opinion that "[t]he problem . . . with providing the foster parents the renewed right to intervene in the neglect proceeding is that, with [John's] death, the landscape for that neglect proceeding is markedly different. By granting the foster parents this relief, this court is providing them the opportunity to intervene in a proceeding that is, if not hollow, then, at the very least, irreparably changed from the case in which the foster parents initially sought to intervene." We agree that John's death is a change that will need to be taken into account in any proceeding under § 46b-129 relating to Jewelyette's best interest. But that is not the issue with respect to mootness. The issue, rather, is whether this court can afford the foster parents any practical relief in the matters currently pending before this court, and the answer is yes. At the time of their intervention, the sole issue before the trial court, as framed by the parties, was whether, notwithstanding John's personal rehabilitation efforts, it was in Jewelyette's best interest to remain with her foster parents given her deep emotional and psychological ties to them. Section 46b-129 (m) authorizes the trial court to deny revocation, even if it finds that the original cause for commitment (in this case, John's addiction, mental health issues and criminal recidivism) no longer exists. See, e.g., *In re Juvenile Appeal (Anonymous)*, supra, 177 Conn. 658 ("[r]ecognizing that cause for commitment no longer existed from the time the petition for revocation was brought, the court nevertheless concluded that separation of the child from her foster family at that time would be contrary to her best interests, and consequently denied the [mother's] petition for revocation"). At the conclusion of the 2023 revocation trial, the trial court found that, notwithstanding John's efforts to rehabilitate, "[Jewelyette's] stability and her hope for the future lie in the stable placement that she has with [her] foster family. To remove her from it would be to blight her life

177 Conn. 663 ("[t]he factors to be considered in [determining whether to revoke commitment] include: (1) the length of [the child's] stay with her foster parents; (2) the nature of her relationship [with] her foster parents; (3) the degree of contact maintained with the natural parent; and (4) the nature of her relationship [with] her natural parent").

The foregoing discussion also answers the concern expressed in Judge Elgo's dissenting opinion that intervention should not be permitted at the dispositional phase because the participation of foster parents as intervenors will cause trial courts to make improper "comparisons" between natural and foster parents. Part III of Judge Elgo's dissenting opinion. We reiterate that "[t]he parent's loss of custody should not . . . be premised solely on tangible material benefits to the child at the expense of the intangible, [nonmaterial] advantages [that] a parent's care can provide even when the parent has only limited financial resources. . . . Rather,

---

in perpetuity." The best interest inquiry plainly remains front and center after the death of John, and, had the foster parents not been improperly removed as intervenors on the basis of the now overruled holding in *In re Ryan C.*, their restored status as intervenors (unless successfully challenged on remand on other grounds) entitles them to participate in the hearings that now must be held regarding Jewelyette's best interest in light of John's death. If anything, the changed circumstances make all the more pressing the need to resolve that issue in accordance with proper procedures.

With respect to the stay of further trial court proceedings issued by this court on January 24, 2025, pending resolution of the matters sub judice in this court, the stay was issued because, among other reasons, it appeared likely that doing so would expedite rather than delay the ultimate resolution of this case. Our concern was that adopting the wait and see approach commended by Justice D'Auria would likely result in substantial additional delays as the foster parents pursued appeals from the new orders raising the very same claims of error raised in the matters now before us, i.e., that they were excluded from the proceedings improperly under the authority of *In re Ryan C.*, which was wrongly decided, and that their statutory right to be heard was improperly limited in the same manner it was violated at the hearing held by the same trial judge on November 4, 2024, only two and one-half months earlier.

[courts] must continue to be guided by what is best for the child's welfare, but . . . place the advantages of a parent's care high in the scale of factors conducive to that welfare. In any controversy between a parent and a stranger the parent as such should have a strong initial advantage, to be lost only [when] it is shown that the child's welfare plainly requires custody to be placed in the stranger." (Citation omitted; footnote omitted; internal quotation marks omitted.) *In re Juvenile Appeal (Anonymous)*, supra, 177 Conn. 661–62.

When her opinion reaches the issue of statutory construction that is the proper subject of this appeal, Judge Elgo is left to argue that our construction of § 46b-129 is at odds with the obligation of foster parents, under various department regulations, "to support the [commissioner's permanency] goals or, at least, not to act in contravention of them . . . ." Part II of Judge Elgo's dissenting opinion. She contends that, "[b]ecause the role and responsibility of foster parents are circumscribed by statute and regulation, the doctrine of permissive intervention, which requires a movant to advance an interest distinct from that of existing parties, is simply incompatible with the existing statutory and regulatory framework that allows the department to define and to control the responsibilities of foster parents, especially with respect to the child and their biological parents." Id.

This argument fails to confront the fact that the statutory and regulatory framework relied on by Judge Elgo existed throughout the time that foster parents enjoyed automatic standing to intervene in cases such as the present one. That framework was not perceived by the legislature prior to 2001 as a reason to deny foster parents automatic standing, and there is no indication that the same framework factored into the legislature's decision in 2001 to remove the right to automatic standing from General Statutes (Rev. to 2001) § 46b-129 (o).

The legal obligations of foster parents identified by Judge Elgo have never been understood to prohibit foster parents from intervening to advocate for the child's best interest in a proceeding pursuant to § 46b-129. If the legislature wishes to enact such a prohibition, it may do so, but we will not read that policy into the statute. See, e.g., *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, 316 Conn. 790, 803–804, 114 A.3d 1181 (2015) ("[i]t is not the province of this court, under the guise of statutory interpretation, to legislate . . . a [particular] policy, even if we were to agree . . . that it is a better policy than the one endorsed by the legislature as reflected in its statutory language").[31]

Judge Elgo's final two points involve concerns about delays that may be caused by permitting intervention. Again, both of these assertions are policy based as opposed to textual or strictly statutory. She contends that allowing permissive intervention in neglect proceedings could prolong the proceedings to the detriment of the child and points to the present case as an example of such a delay. See part III C of Judge Elgo's dissenting opinion. Again, we trust our trial courts to adhere to the directives of Practice Book § 35a-4 (d) when ruling on a motion to intervene. That subsection

---

[31] The legislature's response to this court's decision in *Nye* v. *Marcus*, 198 Conn. 138, 502 A.2d 869 (1985), further undercuts Judge Elgo's argument. In *Nye*, this court held that only natural parents or legal guardians, not foster parents, had standing to bring a petition for a writ of habeas corpus pursuant to § 52-466 to prevent the department from removing a foster child from their care in contravention of the department's permanency plan. See id., 144. In response, the legislature enacted No. 88-332, § 3, of the 1988 Public Acts (P.A. 88-332), which amended the habeas statute to provide that "[a] foster parent or an approved adoptive parent shall have standing to make application for a writ of habeas corpus regarding the custody of a child currently or recently in his care . . . ." P.A. 88-332, § 3, codified as amended at General Statutes § 52-466 (f). That the legislature abrogated our decision in *Nye* adds further support for the view that permissive intervention is not inconsistent with the statutory and regulatory framework governing foster parents generally.

directs the judicial authority to consider, among other things, "the timeliness of the motion as judged by the circumstances of the case" and "whether the intervention may cause delay in the proceedings or other prejudice to the existing parties . . . ." Practice Book § 35a-4 (d). As to the present case, the record contradicts Judge Elgo's assertion that intervention by the foster parents caused any undue delay in the proceedings below.

The fact that a decision on the June, 2021 motion to revoke commitment was not rendered until May, 2023, had nothing to do with the foster parents' intervention; the delay appears to have been caused by the combined effect of pandemic related court delays and the unexpected withdrawal of Berman as Jewelyette's counsel. Indeed, the trial court placed primary responsibility for the case's longevity on the department and John. No doubt there has been additional delay caused by the complications arising from the Appellate Court's decision in *In re Ryan C.*, but, in fairness, responsibility for those delays cannot be attributed to the foster parents.

Relatedly, Judge Elgo suggests that our construction of § 46b-129 could have the effect of delaying permanency insofar as a natural parent could point to a foster parent's intervention as evidence that the natural parent "has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of [another]," which is one of seven factors a trial court must consider when determining whether to terminate parental rights under § 17a-112 (k). General Statutes § 17a-112 (k) (7). This policy concern is purely speculative and is not borne out by the case law. The very premise of the argument—intervention in the dispositional phase of a neglect proceeding could be seen as an unreasonable act of interference within the meaning of § 17a-112—finds no support in the statutory scheme itself, which expressly authorizes any party,

including any intervenor, to oppose the department's
permanency plan for a child. See General Statutes § 46b-
129 (k) (1) (A) ("Any party seeking to oppose the com-
missioner's permanency plan . . . shall file a motion
in opposition not later than thirty days after the filing
of the commissioner's motion for review of the perma-
nency plan, which motion shall include the reason
therefor. . . . The court shall hold evidentiary hearings
in connection with any contested motion for review of
the permanency plan . . . . The court shall provide
notice to the child or youth, the parent or guardian of
such child or youth, *and any intervenor* of the time
and place of the court hearing on any such motion not
less than fourteen days prior to such hearing." (Empha-
sis added.)). And, again, we are confident that our trial
courts are more than capable of discerning between
reasonable and unreasonable conduct when called on
to determine whether a foster parent has prevented a
parent from maintaining a meaningful relationship with
his or her child.[32]

The December 11, 2023 order of the trial court remov-
ing the foster parents as intervenors is reversed in SC
21055, the writ of error in SC 21068 is granted in part

---

[32] Judge Elgo also suggests that the foster parents' intervention in the
present case is an example of the type of interference that would constitute
an unreasonable act of interference under § 17a-112 (k) (7). She asserts,
among other things, that "[t]he record before us, and Humphrey's 2021
report in particular, contains evidence that, if credited, suggests that the
foster parents did in fact interfere with reunification in the present case."
Footnote 36 of Justice Elgo's dissenting opinion. But the fact is that the
trial court did *not* credit this evidence. See, e.g., *Lapointe* v. *Commissioner
of Correction*, 316 Conn. 225, 304, 112 A.3d 1 (2015) (noting "the state
constitutional prohibition against fact-finding by an appellate tribunal"). To
the contrary, the trial court found "*no credible evidence*" that the foster
parents had interfered with John's relationship with Jewelyette. (Emphasis
added.) The trial court further found, based on witness testimony, "that the
foster parents . . . never overstepped boundaries and never denigrated
John in Jewelyette's presence." These findings dispose of Judge Elgo's con-
tention.

and the trial court's November 4, 2024 revocation order is vacated, and the case is remanded for further proceedings consistent with this opinion.

In this opinion McDONALD, ALEXANDER and DANNEHY, Js., concurred.